1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ROBERT TARR,

11          Petitioner,                    No. CIV S-08-2946-TJB

12     vs.                                 ORDER DENYING PETITION FOR WRIT OF
                                           HABEAS CORPUS; DIRECTING CLERK OF
13    MICHAEL EVANS,                       COURT TO ENTER JUDGMENT; AND
                                           DECLINING ISSUANCE OF CERTIFICATE OF
14          Respondent.                    APPEALABILITY

15    _____/

16                          I.  INTRODUCTION

17          Petitioner Robert Tarr is a state prisoner proceeding pro se with a petition for writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have

19    consented to the jurisdiction of the United States Magistrate Judge.  *See* Pet'r's Consent 1, ECF

20    No. 4;[1]  Resp't's Consent 1, ECF No. 11.  For the following reasons, the habeas petition is denied.

21    ///

22    ────────────────────────

23          [1] The Case Management/Electronic Case Files (CM/ECF) docketing and file system is
       implemented, which allows the parties to electronically file pleadings and documents.  For
       pleadings or documents submitted in paper format, the filing is scanned and stored electronically
24    into the CM/ECF system, except for lodged documents.  Each page of the electronic filing is
       numbered chronologically, whether or not the party numbered it.  If the filing is lengthy, the
25    document is divided into parts.  Here, when a page number for a filed pleading or document is
       cited, the CM/ECF page number is used when available, which may not coincide with the page
26    number that the parties used.

                                           1

## II.  PROCEDURAL HISTORY

On June 19, 2006, a Yuba County jury found Petitioner guilty of (1) continuous sexual abuse of a child under the age of fourteen, CAL. PENAL CODE § 288.5(a) (count one); (2) substantial sexual conduct with a victim under the age of fourteen; *id.* § 1203.066(a)(8) (count one); and (3) committing great bodily injury, *id.* § 12022.7(a) (count one).  Lodged Doc. 10, Clerk's Tr. vol. 1, 201-03

On September 5, 2006, "[t]he trial court sentenced [Petitioner] to 19 years in state prison (the upper term of 16 years under section 288.5, subd. (a)), plus three years consecutive for the great-bodily-injury enhancement)."  Lodged Doc. 3, at 1; *see* Lodged Doc. 10, Clerk's Tr. vol. 2, 351-52.

Petitioner directly appealed to the California Court of Appeal, Third Appellate District. *See* Lodged Doc. 1.  On March 21, 2008, the California Court of Appeal issued a reasoned decision affirming the judgment.  *See* Lodged Doc. 3.

On April 22, 2008, Petitioner filed a petition for review with the California Supreme Court.  *See* Lodged Doc. 4.  On June 18, 2008, the California Supreme Court denied the petition without comment or citation.  *See* Lodged Doc. 5.

On December 7, 2007, Petitioner filed a petition for writ of habeas corpus with the California Court of Appeal, Third Appellate District.  *See* Lodged Doc. 6.  On January 17, 2008, the California Court of Appeal denied the petition without comment or citation.  *See* Lodged Doc. 7.

On April 30, 2008, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court.  *See* Lodged Doc. 8.  On October 28, 2008, the California Supreme Court denied the habeas petition without comment or citation.  *See* Lodged Doc. 9.

On December 3, 2008, Petitioner filed the instant federal habeas petition.  *See* Pet'r's Pet., ECF No. 1.  On December 15, 2008, Petitioner consented to the jurisdiction of a United States Magistrate Judge.  *See* Pet'r's Consent 1.  On April 9, 2009, Respondent consented to the

1   jurisdiction of a United States Magistrate Judge.  *See* Resp't's Consent 1.  On July 29, 2009,

2   Respondent filed an answer, *see* Resp't's Answer, ECF No. 17, to which Petitioner filed a

3   traverse on August 24, 2009, *see* Pet'r's Traverse, ECF No. 19.

4                              III.  FACTUAL BACKGROUND[2]

5           The victim, J.M., is [Petitioner's] daughter.  At the age of 11, she
            was placed in [Petitioner's] home after being removed from her
6           mother's custody pursuant to Welfare and Institutions Code section
            300.  Up until then, he had been unaware of her existence.
7
            [Petitioner] lived with his longtime girlfriend, J.J., her daughter,
8           T.M., and T.M.'s two sons.  When J.M. came to stay with
            [Petitioner], they were renting a house on Marysville Road in
9           Dobbins and building another on Manzanita Lane in Oregon House
            (both in Yuba County, California).
10
            About a year and half after J.M. moved in, according to her
11          testimony, [Petitioner] fondled her breasts, reaching over her
            shoulder and inside her shirt as she sat at the computer in the
12          Manzanita Lane house, then rubbing her breasts in a circular
            motion.  He also touched her vagina under her clothing, rubbing it
13          in a circular motion and inserting his finger.  Then he developed
            the habit of entering her room and fondling her under her clothing
14          almost every night, whether in the Marysville Road house or the
            Manzanita Lane house, even though others were often in the house.
15          He would call her "pretty baby" and "special" and make grunting
            noises as he touched her.
16
            About three times, [Petitioner] tried to penetrate J.M.'s vagina with
17          his penis, though she squirmed and resisted; he succeeded once,
            causing her discomfort.  Afterward he said:  "This will be our little
18          secret.  You don't need to tell anybody."  He also rubbed his penis
            on J.M.'s vagina until he ejaculated.  Another time, he tried to put
19          her hand on his penis inside his pants, but she pulled away.

20          After J.M. had gone two months without a period, she told
            [Petitioner].  In July 2004, he asked if she had been sexually active
21          and provided her a home pregnancy test, which purported to show
            that she was not pregnant.
22

23          ────────────────────

24          [2] These facts are from the California Court of Appeal's opinion issued on March 21,
     2008.  Lodged Doc. 3, at 2-6.  Pursuant to the Antiterrorism and Effective Death Penalty Act of
25   1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts
     that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v.*
     *Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.
26   2004).

                                          3

Later in July 2004, J.M. told a friend that [Petitioner] had been touching her inappropriately.  That afternoon, Yuba County Sheriff's Sergeant Melford Duncan interviewed her.  Seeming very upset, J.M. told a story similar to the one she told at trial; however, she did not say that [Petitioner] penetrated her, she said that no one else was home when the molestations occurred, and she did not mention any occurrences at the Marysville Road house.[3]

Interviewed the next morning by Sergeant Duncan, [Petitioner] claimed innocence.

In an MDIC interview the following day, J.M. said that [Petitioner] had molested her nearly every day.

Interviewed again about a week later, [Petitioner] still denied inserting his penis into J.M. or impregnating her.  He admitted that he might have touched her breasts accidentally, that she might have come into contact with his penis, that he called her "pretty baby," and that he had bought her a home pregnancy test.

J.M. gave birth to a daughter in February 2005.  Criminalists at the California Department of Justice (DOJ) obtained and tested DNA from [Petitioner], J.M., and the infant.  According to criminalist Deanna Kacer, the DNA results showed an overwhelming likelihood that [Petitioner] was the infant's father.

Kacer analyzed the DNA samples using nine loci and applying the short tandem repeats (STR) and polymerase chain reaction (PCR) methods, the most sophisticated DNA testing methods in current use.[4]  Then, using the FBI's population databases for the three major ethnic groups in the United States as a benchmark, she calculated [Petitioner's] "paternity indices" (the probability that [Petitioner] was the father, divided by the probability that a random

---

[3] Sergeant Duncan did not question J.M. in great depth because he knew that [Petitioner] would be arriving at the school to pick her up within 30 minutes, he wanted only to get enough information at that point to find out if there was a basis for a Child Protective Services hold and then to investigate further with [Petitioner], and he knew that if the matter was pursued there would be another interview at the MDIC (Multi-Disciplinary Interview Center).

[4] PCR testing amplifies targeted loci by replicating the process by which DNA duplicates itself naturally.  It is applied to STR fragments of DNA, which consist of a class of repeated units including only a few base pairs.  (*People v. Smith* (2003) 107 Cal.App.4th 646, 654-655.) California courts have repeatedly approved these methods.  (*Id.* at p. 665; *see also People v. Johnson* (2006) 139 Cal.App.4th 1135, 1149; *People v. Henderson* (2003) 107 Cal.App.4th 769, 779; *People v. Hill* (2001) 89 Cal.App.4th 48, 57; *People v. Allen* (1999) 72 Cal.App.4th 1093, 1098-1101.)

man was the father).[5]  Any number over 10,000 is strong evidence of paternity.  [Petitioner's] paternity indices were 760,000 compared to a random Caucasian man, 1.3 million compared to a random Hispanic man, and 2.5 million compared to a random African-American man.  Furthermore, his DNA "contain[ed] all of the paternal types required in order to create this particular child."

[Petitioner's] daughter, K.T., and J.J.'s daughter, P.B., testified to his good character.

J.J. testified that she had been with [Petitioner] for 20 years.[6]  She and [Petitioner] were always together, and she had never seen anything inappropriate between [Petitioner] and J.M.  He would go into her room for a couple of seconds at most, always with the door open.  Contrary to J.M.'s testimony, there was no computer at the Manzanita Lane house.[7]  J.M. had consistently misbehaved in [Petitioner's] home; she had also told J.J.'s grandsons that if they did not like conditions at home they could call Child Protective Services.  During 2003 and 2004, the period of the alleged molestations, [Petitioner] had a knee injury which required surgery and resulted in a stiff leg.

T.M., who also lived with [Petitioner] and J.J. in 2003 and 2004, corroborated her mother's testimony.

[Petitioner] presented no expert testimony with respect to the DNA testing.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

---

[5] The California Supreme Court recently approved the use of these databases for DNA testing purposes.  (*People v. Wilson* (2006) 38 Cal.4th 1237, 1240, 1242-1250.)

[6] She admitted that at some time in that span of years she and [Petitioner] were separated -- the time during which J.M., who was not her daughter, was conceived.

[7] In rebuttal, Mary Barr, one of the investigating officers (now the District Attorney's investigator), testified that she saw a computer in the living room of the Marysville Road house in July 2004.

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision

that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

"The relevant state court determination for purposes of AEDPA review is the last reasoned state

court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

must conduct an independent review of the record to determine whether the state court clearly

erred in its application of controlling federal law, and whether the state court's decision was

objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

question under AEDPA is not whether a federal court believes the state court's determination

was incorrect but whether that determination was unreasonable--a substantially higher

threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

"When it is clear, however, that the state court has not decided an issue, we review that question

*de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

545 U.S. 374, 377 (2005)).

V.  CLAIMS FOR REVIEW

The petition for writ of habeas corpus sets forth three grounds for relief.  In ground one, Petitioner argues that "[t]he trial court denied [P]etitioner his due process right to present a defense and his right to confront witnesses by refusing to hold a hearing to admit evidence of the sexual history of the complaining witness."  Pet'r's Pet. 4.  In ground two, Petitioner contends the trial court violated his constitutional rights by imposing the upper term sentence for his conviction under section 288.5(a).  Pet'r's Pet. 4.  In ground three, Petitioner pleads an ineffective assistance of counsel claim.  *Id.* at 5.

A.  Ground One:  Evidence of Victim's Sexual History

In ground one, Petitioner argues that "[t]he trial court's refusal to hold a hearing on evidence of the alleged victim's sexual history denied [P]etitioner his due process right under the Fourteenth Amendment to present a defense."  *Id.* at 7.

1.  Defense Evidence Regarding Victim's Sexual History

Petitioner wanted to present evidence that "the victim acquired knowledge of sexual acts from someone other than [P]etitioner and that someone other than [P]etitioner may have caused her to become pregnant."  *Id.* at 4.  Petitioner wanted to offer evidence "the victim was raped by her brother prior to the time she lived with [P]etitioner" and evidence of "the alleged victim's lewd experiences unrelated to her relationship with [P]etitioner."  *Id.* at 6-7.  Specifically, other evidence involved how J.M. "would sneak down with [her] brother, watch their mother perform sexual acts, fondling and things of that nature.  She had a web cam in her bedroom."  Lodged Doc. 11, Rep.'s Tr. vol. 1, at 210.  Petitioner also sought to show J.M. "wrestl[ed] with [an] adult man other than [Petitioner] in a flirtatious fashion," Lodged Doc. 11, Rep.'s Tr. vol. 1, 205; "would go on family picnics, meet some boy, disappear for a couple of hours," *id.* at 206; would "be hanging all over . . . some man who is, in fact, there with family, *id.*; and "started dressing in a certain fashion that [Petitioner's] family said is inappropriate . . . ," *id.*

According to Petitioner, the purpose of this evidence was to show that "these offenses

7

1   created friction in the house." *Id.*  Petitioner attempted to demonstrate that J.M. "[w]anted to

2   leave" and "wanted to go home" back to her mother.  *Id.* at 206-07.

3          2.  State Court Decisions

4          The prosecutor sought to exclude "any proffered evidence of the [v]ictim's possible other

5   sexual history under Evidence Code Sections 1103 and 782."  Lodged Doc. 10, Clerk's Tr. vol.

6   1, 82.  The trial court ruled that defense counsel's "affidavit [wa]s [in]sufficient to require . . . a

7   hearing . . . ."  Lodged Doc. 11, Rep.'s Tr. vol. 1, 212.  The trial court found the evidence had

8   "barely" any probative value, and amounted to "character assassination."  *Id.* at 212-13.

9          Here, the state court decision appropriate for review is the California Court of Appeal's

10  decision because it is the "last reasoned state court decision" to address Petitioner's evidence

11  claim.  *Delgadillo*, 527 F.3d at 925 (citations omitted).  The California Court of Appeal rejected

12  Petitioner's claim, stating in relevant part:

13              [Petitioner] contends that the trial court prejudicially abused its
                discretion, depriving him of his constitutional rights to mount a
14              defense and to confront the witnesses against him, by refusing to
                hold a hearing pursuant to Evidence Code section 782 as to
15              whether he could present evidence of J.M.'s sexual knowledge and
                conduct.[8]  We conclude that, in light of the prosecution's
16

17
    _____

18          [8] Evidence Code section 782 provides in part:

19              "(a) In any of the circumstances described in subdivision (c)
                [including a prosecution under Section 288.5 of the California
20              Penal Code], if evidence of sexual conduct of the complaining
                witness is offered to attack the credibility of the complaining
21              witness under Section 780, the following procedure shall be
                followed:

22              "(1) A written motion shall be made by the defendant to the court
                and prosecutor stating that the defense has an offer of proof of the
23              relevancy of evidence of the sexual conduct of the complaining
                witness proposed to be presented and its relevancy in attacking the
24              credibility of the complaining witness.

25              "(2) The written motion shall be accompanied by an affidavit in
                which the offer of proof shall be stated.  The affidavit shall be filed
26              under seal and only unsealed by the court to determine if the offer

                                                    8

uncontroverted DNA evidence, any error was harmless beyond a reasonable doubt.

[Petitioner] filed a motion in limine under Evidence Code section 782, with a supporting declaration by counsel averring:  J.M. has had sexual contact with others, or contact that could be described as such.  She has viewed her brother naked and has been caught naked with him under blankets.  The juvenile court had found true in a Welfare and Institutions Code section 300 proceeding that J.M.'s brother had repeatedly molested her; counsel had been informed that J.M. lied about this molestation when interviewed in this case.  J.M. had repeatedly observed sexual acts by her mother and been given access to pornographic materials by persons other than [Petitioner].  J.M. has wrestled with an adult man other than [Petitioner] in a way that could be described as flirtatious.

[Petitioner] also moved in limine to present a third-party culpability defense (without naming any third party), claiming that since he did not have sex with J.M. she must have had sex with someone else.  On this theory, he asserted that to exclude evidence of J.M.'s "sexual history, sexual knowledge, and[/]or sexual conduct" under Evidence Code section 782 would violate his rights to present a complete defense and to confront witnesses.

At the hearing on these motions, defense counsel admitted that only the last alleged sexual conduct by J.M. ("flirtatious" wrestling) was supposed to have occurred after she was removed from her mother's home in May 2002 and placed with [Petitioner].  Counsel also admitted that he knew of no unsupervised contact between J.M. and her brother after the juvenile court's placement order, and that [Petitioner] did not have a twin brother.

---

of proof is sufficient to order a hearing pursuant to paragraph (3).  After that determination, the affidavit shall be resealed by the court.

"(3) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant.

"(4) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780 and is not inadmissible pursuant to Section 352 of this code, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted.  The defendant may then offer evidence pursuant to the order of the court."

The trial court ruled that even if everything in counsel's affidavit was true, it was insufficient to require an Evidence Code section 782 hearing.  Under Evidence Code section 352, its probative value "barely ma[de] the scale" on a scale of one to 10, but its prejudicial effect of "character ass[assi]nation" as to J.M. "approache[d] the 10."[9]

[Petitioner] asserts that his proposed evidence was relevant not only to show an alternative source for J.M.'s sexual knowledge -- her molestation by her brother (cf. *People v. Daggett* (1990) 225 Cal.App.3d 751) -- but to support his challenge to the conclusions drawn from the DNA evidence.  Trial counsel asserted in closing argument that criminalist Kacer did not perform a "kinship analysis" or do "incest calculations."  According to [Petitioner], had the jury also known that J.M.'s brother had molested her and that the DNA analysis did not attempt to exclude him as the father, it might have doubted the conclusiveness of the proof for [Petitioner]'s paternity.  We are not persuaded.

We assume without deciding that the trial court should have conducted an Evidence Code section 782 hearing and should have admitted the proffered defense evidence.  Any error was harmless.  The DNA evidence established beyond a reasonable doubt that [Petitioner] fathered J.M.'s child.  This could have occurred only if [Petitioner] had engaged in substantial sexual conduct with the victim.  Trial counsel's contrary argument was not based on any evidence, but only on questions he asked in cross-examining Kacer.  The defense adduced no expert evidence whatsoever suggesting that [Petitioner]'s DNA was similar to that of his son.  Counsel's questions and the argument built on them were mere insinuation, entitled to no weight in the jury's deliberations.  Furthermore, since counsel admitted in limine that he had no evidence of any unsupervised contact between J.M. and her brother since she was removed from her mother's home, two years before she became pregnant, his molestation of J.M. when she was 11 years old or younger was irrelevant.

Because the DNA evidence overwhelmingly proved [Petitioner]'s guilt, there is no reasonable possibility that the outcome would have differed had the excluded evidence been admitted.  Any error was therefore harmless.

Lodged Doc. 3, at 6-10.

///

---

[9]  Defense counsel asked for "clarification" of this ruling, asserting that if the jury did not hear about J.M.'s prior sexual knowledge it would think she could have learned about sexual acts only from [Petitioner].  The trial court pointed out that by the time [Petitioner]'s alleged acts began, J.M. was already 13 and menstruating.

1            3.  Legal Standard for Exclusion of Evidence of Victim's Sexual History

2         "A state court's evidentiary ruling is grounds for federal habeas corpus relief only if it

3 renders the state proceeding so fundamentally unfair as to violate due process." *Bueno v.*

4 *Hallahan*, 988 F.2d 86, 87 (9th Cir. 1993) (per curiam); *see also Estelle v. McGuire*, 502 U.S.

5 62, 68 (1991) (reemphasizing federal habeas court may not reexamine state court determinations

6 on state law questions.).  The Supreme Court has defined the category of infractions that violate

7 fundamental fairness very narrowly.  *See McGuire*, 502 U.S. at 73.  "To evaluate whether

8 exclusion of evidence reaches constitutional proportions, we should consider five factors:  (1) the

9 probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is

10 capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely

11 cumulative; and (5) whether it constitutes a major part of the attempted defense." *Tinsley v.*

12 *Borg*, 895 F.2d 520, 530 (9th Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991).  The court must

13 then balance the importance of the evidence against the state interest in exclusion.  *Id.*; *Miller v.*

14 *Stagner*, 757 F.2d 988, 994 (9th Cir. 1985).  In so doing, a court must consider the purpose of the

15 rule; its importance; how well the rule implements its purpose; and how well the purpose applies

16 to the case at hand.  *Stagner*, 757 F.2d at 994-95.  The court must give due weight to the

17 substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding

18 unreliable or prejudicial evidence.  *Id.*

19         Even if exclusion of the evidence amounts to constitutional error, in order to justify

20 federal habeas relief, the erroneous exclusion must have had "a substantial and injurious effect"

21 on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Habeas petitioners must

22 therefore establish that the error resulted in "actual" prejudice.  *See id.*

23            4.  Analysis

24         Here, Petitioner's due process rights were not violated by the state courts' decisions.  The

25 probative value of J.M.'s sexual history was de minimis.  *Tinsley*, 895 F.2d at 530.  J.M. "went to

26 live with [Petitioner] some time prior to May of '02 and then was apparently removed from his

1   home some time in July '04."  Lodged Doc. 11, Rep.'s Tr. vol. 1, 188.  As the trial court

2   recounted and the California Court of Appeal properly recognized, "defense [counsel] knew of

3   no unsupervised contact between J.M. and her brother after the juvenile court's placement order,

4   and that [Petitioner] did not have a twin brother."  Lodged Doc. 3, at 8; *cf.* Lodged Doc. 11,

5   Rep.'s Tr. vol. 1, 188-89.

6          The State had a significant interest in excluding this evidence, because the probative

7   value was clearly outweighed by its potential for misleading or prejudicing the jurors.  *See*

8   *Tinsley*, 895 F.2d at 531.  "[T]he Legislature recognized that evidence of the alleged victim's

9   consensual sexual activities with others has little relevance to whether consent was given in a

10  particular instance."  *People v. Chandler*, 56 Cal. App. 4th 703, 707, 65 Cal. Rptr. 2d 687 (1997)

11  (footnote omitted).  This restriction on admissible evidence does not deny a defendant the due

12  process right of a fair trial.  *People v. Blackburn*, 56 Cal. App. 3d 685, 690, 128 Cal. Rptr. 864

13  (1976).  It "no more deprives a defendant of a fair trial than do the rules of evidence barring

14  hearsay, opinion evidence, and privileged communications."  *Id.*  "[T]he Constitution leaves to

15  the judges who must make these decisions "wide latitude" to exclude evidence that is "repetitive

16  . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion

17  of the issues."  *Crane v. Kentucky*, 476 U.S. 683, 689-90 (citing *Delaware v. Van Arsdall*, 475

18  U.S. 673, 679 (1986)).

19         The proffered evidence was also not the "sole evidence" on defense counsel's argument

20  that J.M. wanted to return to her mother's home.  *Tinsley*, 895 F.2d at 530.  On cross

21  examination, defense counsel questioned J.M. on whether "she used to write [to her] mother and

22  tell her that [she] . . . wanted to go home."  Lodged Doc. 11, Rep.'s Tr. vol. 2, 307.  Defense

23  counsel also asked J.M. whether she remembered "writing a letter to [her] mother where [she]

24  didn't call [Petitioner] "Father" or "Dad[.]"  [Rather], [she] called him "Bob[.]"  *Id.*

25  Additionally, defense counsel questioned J.M. on whether she told T.M.'s children "that if they

26  didn't like what their parents did to discipline them[,] they could call Child Protective

12

1   Services[.]" *Id.* at 313.  J.M. denied writing these letters and telling T.M.'s children that they

2   could call Child Protective Services if they "didn't like what their parents did to discipline them .

3   . . [.]" *Id.* at 307, 313.

4           Defense counsel then called T.M. as a witness when attempting to impeach J.M.'s denial

5   of telling T.M.'s children to call Child Protected Services:

6               [DEFENSE COUNSEL:]  All right.  Did [J.M.] ever in front of
                you tell your boys that if they didn't like doing something they
7               could call Child Protective Services?

8               . . . .

9               [T.M.:]  Yes.

10              . . . .

11              [DEFENSE COUNSEL:]  Did that bother you?

12              [T.M.:]  Yes, it did.  Because I told my children, "You call CPS,
                you better call an ambulance and the cops, call 911 because you're
13              going on a stretcher and I'm going to jail."

14              [DEFENSE COUNSEL:] Is that what you told them?

15              [T.M.:]  Yes, I did.  I didn't appreciate that.

16  *Id.* at 534.  The record shows that the proffered evidence was "cumulative" of defense counsel's

17  argument that J.M. wanted to return to her mother's home.  *Tinsley*, 895 F.2d at 530.

18          Even if the state court erred in excluding the evidence, the error was harmless.  *Brecht*,

19  507 U.S. at 637 (finding federal court may grant habeas relief based on trial error only when that

20  error had substantial and injurious effect or influence in determining jury's verdict); *Calderon v.*

21  *Coleman*, 525 U.S. 141, 145 (1998) (same).  The DNA evidence shows that "[M.M.] is the

22  biological child of [J.M.] and [Petitioner]."  Lodged Doc. 11, Rep.'s Tr. vol. 2, 592.  Petitioner

23  produced no evidence that Petitioner's DNA was similar to that of an adult man, other than

24  Petitioner, with whom J.M. flirted.  Further, since defense counsel admitted he had no evidence

25  of unsupervised contact between J.M. and her brother since she was removed from her mother's

26  home, the brother's molestation of J.M. is irrelevant.  Lodged Doc. 11, Rep.'s Tr. vol. 1, 188-89.

                                                13

1    Petitioner is unable to establish prejudice, and this claim fails.

2        B.  Ground Two:  Upper Term Sentence

3        In ground two, Petitioner argues the trial court violated his constitutional rights by

4    imposing an upper term sentence of sixteen years for his conviction under Section 288.5(a) of the

5    California Penal Code.  Pet'r's Pet. 4.  Specifically, Petitioner argues that the trial court imposed

6    an upper term sentence based on facts not found by the jury beyond a reasonable doubt.  While

7    the trial court did commit error, Petitioner is not entitled to relief because the error was harmless.

8        1.  Background

9        For count one, on the underlying offense of continuous sexual abuse of a child under the

10   age of fourteen, the trial court imposed the upper term of sixteen years because of:  (1) J.M.'s

11   vulnerability under the current Rule 4.421(a)(3) of the California Rules of Court; and (2)

12   Petitioner taking advantage of a position of trust under the current Rule 4.421(a)(11):

13        [THE COURT:]  Also, in aggravation, under [4.]421(a)(3), as I
          said, in going through the probation eligibility criteria, [J.M.] is
14        probably the most vulnerable 288 victim I have ever seen, given
          the history that she lived prior to moving in to [Petitioner's] home,
15        his knowledge of that history, which leads me then to
          [4.]421(a)(11); knowing that, he violated ultimately the position of
16        trust that the Juvenile Court put him in and C.P.S. put him in when
          [J.M.] was placed in his home.

17        In my mind, the appropriate disposition is the upper term for the
          288.5, three years for the 12022.7.
18

19   Lodged Doc. 11, Rep.'s Tr. vol. 3, 780.

20        2.  State Court Decision

21        Here, the state court decision appropriate for review is the California Court of Appeal's

22   decision because it is the "last reasoned state court decision" to address Petitioner's upper term

23   sentence claim.  *Delgadillo*, 527 F.3d at 925 (citations omitted).  The California Court of Appeal

24   rejected Petitioner's claim, stating in relevant part:

25        [Petitioner] contends that his upper-term sentence violated
          *Cunningham* [*v. California*] . . . [(2007)] 549 U.S. [270,] [166
26        L.Ed.2d 856] because it was based on facts not tried to the jury

14

and found true beyond a reasonable doubt.  We conclude that the sentencing error was harmless beyond a reasonable doubt.

*Cunningham* error is harmless "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury[.]"  (*People v. Sandoval* (2007) 41 Cal.4th 825, 839.)  This is the case here.

The trial court imposed the upper term based on the following factors in aggravation:  (1) J.M. was "probably the most vulnerable 288 victim I have ever seen, given the history that she lived prior to moving in to [Petitioner's] home, [and] his knowledge of that history[.]"  (2) "[K]nowing that, he violated ultimately the position of trust that the Juvenile Court put him in and C.P.S. put him in when [J.M.] was placed in his home."

We conclude beyond a reasonable doubt that a jury applying the beyond-a-reasonable-doubt standard would have found true that, as J.M.'s biological father, entrusted with her care by the juvenile court and Child Protective Services, [Petitioner] egregiously violated his position of trust.  Therefore, the trial court's *Cunningham* error is harmless.  (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 839.)

Lodged Doc. 3, at 11.

### 3. Legal Standard for Imposition of Upper Term Sentences

The United States Supreme Court clearly stated that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'"  *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *accord Cunningham*, 549 U.S. at 274-75.  "[S]tatutory maximum" means "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  *Blakely*, 542 U.S. at 303.

Under California's determinate sentencing law ("DSL"), "[t]he statute defining the offense prescribes three precise terms of imprisonment--a lower, middle, and upper term sentence."  *Cunningham*, 549 U.S. at 277.  Because "an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance[,]" *id.* at 288, the DSL's middle term

1  is "the relevant statutory maximum." *Id.* In *Cunningham*, the Supreme Court held that

2  California's DSL violates a defendant's right to a jury trial to the extent it permits a trial court to

3  impose an upper term based on facts found by the court rather than by a jury. *Id.* at 293.

4          Even if a trial court violates a petitioner's Sixth Amendment rights, the violation is

5  subject to the harmless error test under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Butler*

6  *v. Curry*, 528 F.3d 624, 648-49 (9th Cir. 2008) (conducting harmless error review of *Apprendi*

7  violation). Applying *Brecht*, a habeas court must determine whether "the error had a substantial

8  and injurious effect on [Petitioner's] sentence." *Id.* at 648 (quoting *Hoffman v. Arave*, 236 F.3d

9  523, 540 (9th Cir. 2001)) (internal quotation marks omitted). "Under that standard, we must

10  grant relief if we are in 'grave doubt' as to whether a jury would have found the relevant

11  aggravating factors beyond a reasonable doubt." *Id.* (citing *O'Neal v. McAninch*, 513 U.S. 432,

12  436 (1995)).

13          4.  Analysis

14          The California Court of Appeal reasonably held that "the trial court's *Cunningham* error

15  is harmless." Lodged Doc. 3, at 11 (citation omitted). First, no reasonable jury would conclude

16  that J.M. was not a particularly vulnerable victim under Rule 4.421(a)(3). The "particularly

17  vulnerable" sentencing factor means the victimFebruary 22, 2011 is vulnerable "'in a special or

18  unusual degree, to an extent greater than in other cases [and is] defenseless, unguarded,

19  unprotected, accessible, assailable . . . [or] susceptible to the defendant's criminal act.'

20  [Citation.]" *People v. Clark*, 50 Cal. 3d 583, 638, 268 Cal. Rptr. 399, 789 P.2d 127 (1990).

21  Where, as here, age is an element of the offense, a court cannot base a finding of particular

22  vulnerability using the victim's age alone. *People v. Dancer*, 45 Cal. App. 4th 1677, 1693-94

23  (1996). However, a victim's extremely young age together with other circumstances, such as the

24  time and location of the offense, can establish the particular vulnerability factor. *Id.* at 1694.

25          Here, the evidence shows that J.M. began living with Petitioner after being removed from

26  her mother's home, where J.M. "was sexually molested by her brother on multiple occasions."

Lodged Doc. 11, Rep.'s Tr. vol. 1, 184.  J.M. lived with Petitioner for approximately three years, and Petitioner began molesting J.M. at the end of the second year, when she was twelve years old.  Lodged Doc. 11, Rep.'s Tr. vol. 1, 28-29, 31.  In the first instance, Petitioner "touched [J.M.'s] breasts while she was sitting in front of the computer."  *Id.* at 29; *cf. People v. Huber*, 181 Cal. App. 3d 601, 629, 227 Cal. Rptr. 113 (1986) ("There simply is no question but that a woman asleep in her darkened residence is more vulnerable than a woman fending off a rapist on a dark street or in a public restroom.").  After that, the touchings occurred "every other day," while "she lived on Manzanita[,] and some occurred while she lived on Marysville Road." Lodged Doc. 11, Rep.'s Tr. vol. 1, 30-31.  There was substantial evidence to support the finding that J.M. was particularly unprotected, accessible, and assailable.

Second, there was substantial evidence to support the finding that Petitioner took advantage of a position of trust.  Petitioner was entrusted with J.M.'s care after she was removed from her mother's home by child services.  Lodged Doc. 11, Rep.'s Tr. vol. 2, 306.  He was her biological father and took on a parental role with J.M., including making her go to school, *id.* at 380; teaching her morals, *id.* at 500; requiring her to do her homework, *id.* at 515; and insisting she participate in "family work," e.g. washing the dishes, *id.* at 516, 533.  *See, e.g.*, *People v. Clark*, 12 Cal. App. 4th 663, 666, 15 Cal. Rptr. 2d 709 (1992) (finding victim particularly vulnerable because defendant resided in home and defendant took advantage of position of trust as victim's stepfather and caretaker); *People v. Jones*, 10 Cal. App. 4th 1566, 1577, 14 Cal. Rptr. 2d 9 (1992) (noting defendant, as victim's biological father, plainly occupies position of trust and confidence so as to justify aggravation of sentence on that ground when he is found to have committed sex crimes against his child).  Any error on the trial court's behalf was harmless, and habeas relief is not warranted for the upper term sentence on count one.

///

///

///

17

C.  Ground Three:  Ineffective Assistance of Counsel

In ground three, Petitioner argues appellate counsel was deficient for failing "to raise, on direct appeal, an issue of jury misconduct."  Pet'r's Pet. 5.  According to Petitioner, "the jury was sent home for the weekend," and "[d]uring th[at] weekend, one of the jurors . . . creat[ed] a graph which he felt could persuade other jurors to vote his way of thinking regarding DNA evidence." *Id.* at 5.  Petitioner asserts his "right to a fair and impartial jury was violated because . . . the jury was persuaded by evidence not presented at trial."  *Id.* at 10.  Petitioner contends appellate counsel was "made aware of this issue by [P]etitioner's trial counsel," but "felt this issue was not cognizable on appeal."  *Id.*

1.  Background

On Friday, June 16, 2006, at around 4:30 p.m., the jury advised the bailiff that they wished to take a break from deliberations.  Lodged Doc. 10, Clerk's Tr. vol. 1, 263, 267.  The jury and the trial court exchanged several notes, including one where the trial court asked if they believed "further deliberations on Monday could produce a verdict."  *Id.* at 255.  The jury foreperson wrote back, "Yes - we will return Monday, but truly dont [sic] believe we can come to a verdict at this time[,] on Monday or not [at] all.  We are divided at this time."  *Id.* at 255, 258.

The trial court then brought in the foreperson for questioning.  *Id.* at 258.  The trial court asked if "there's a reasonable probability the jury could come to a verdict," to which the foreperson replied, "Possibility."  *Id.* at 259.  At this time, seven out of twelve members thought Petitioner was guilty.  *Id.* at 267.  The jury was then released for the weekend.  *Id.* at 268.

Over the weekend, one juror created a graph at home "to show other jurors how DNA worked in this case."  *Id.* at 264.  On Monday, June 19, 2006, the juror showed "some of the jurors the graph in order to explain how DNA worked in this case."  *Id.*  The jury began deliberations again and reached a verdict on the morning of June 19, 2006.  *Id.*

On August 17, 2006, defense counsel filed a motion for a new trial based on, *inter alia*, jury misconduct.  *Id.* at 233.  Defense counsel argued that "Mr. [REDACTED]'s conduct in

18

1  making the graph and bringing it to the jury room, and the conduct of Mr. [REDACTED] and the

2  jurors who selectively deliberated with him unbeknownst to the other jurors, was obvious

3  misconduct." *Id.* at 240.

4       On August 28 and 29, 2006, the trial court held a hearing on Petitioner's motion for a

5  new trial.  The trial court found no jury misconduct and denied the motion for a new trial.

6  Lodged Doc. 11, Rep.'s Tr. vol. 3, 764.  The trial court reasoned that the graph merely reflected

7  the juror's "thoughts on paper.  He could have done that in the jury deliberation room on Friday

8  afternoon.  He could have done it on Monday morning . . . He then showed it to some of the

9  jurors." *Id.* at 763.  The trial court found "nothing . . . that suggests he had any specialized

10 knowledge, he read anything, he watched anything, he went on the Internet, that he did any

11 investigation." *Id.* at 743.

12            2.  State Court Decisions

13      Petitioner raised his ineffective assistance of counsel claim in his state habeas petitions

14 filed with the California Court of Appeal and the California Supreme Court.  *See* Lodged Doc. 6,

15 at 3 (California Court of Appeal); Lodged Doc. 8, at 1 (California Supreme Court; Memorandum

16 of Points and Authorities).  Both the California Court of Appeal and California Supreme Court

17 denied Petitioner's state habeas petitions without comment or citation.  *See* Lodged Doc. 5

18 (California Court of Appeal); Lodged Doc. 9 (California Supreme Court).

19      Where no reasoned opinion exists, an independent review of the record is conducted to

20 determine whether the state court clearly erred in its application of controlling federal law, and

21 whether the state court's decision was objectively unreasonable.  *Delgado*, 223 F.3d at 981-82.

22 Since neither the California Court of Appeal nor the California Supreme Court issued a reasoned

23 decision on their denial of the ineffective assistance of counsel claim, an independent review of

24 the record will be conducted.  *Id.*

25 ///

26 ///

3.   Legal Standard for Ineffective Assistance of Counsel Claim

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court sets forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  An allegation of ineffective assistance of counsel requires that a petitioner establish two elements:  (1) counsel's performance was deficient; and (2) the petitioner was prejudiced by the deficiency.  *Id.* at 687; *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).

First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  To this end, a petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *Id.* at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  *Id.*  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  *Strickland,* 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Williams,* 529 U.S. at 391-92; *Laboa v. Calderon,* 224 F.3d 972, 981 (9th Cir. 2000).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697.  Since the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  However, certain instances are

20

1  legally presumed to result in prejudice, e.g., where there was an actual or constructive denial of

2  the counsel's assistance, or where the State interfered with counsel's assistance.  *Id.* at 692; *see*

3  *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).

4          4.  Analysis

5          Petitioner cannot establish he was prejudiced by counsel's failure to raise his jury

6  misconduct claim on direct appeal.  An attorney's failure to raise a meritless argument on appeal

7  does not constitute ineffective assistance of counsel.  *Jones v. Smith*, 231 F.3d 1227, 1239 n.8

8  (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)) ("Because . . . the

9  discrepancy was not grounds for reversal, Petitioner was not prejudiced by any failure to raise the

10  issue on direct appeal."); *see Rhoades v. Henry*, 596 F.3d 1170, 1179 (9th Cir. 2010) (holding

11  counsel did not render ineffective assistance in failing to investigate or raise argument on appeal

12  where "neither would have gone anywhere"); *see also Matylinsky v. Budge*, 577 F.3d 1083, 1094

13  (9th Cir. 2009) (concluding counsel's failure to object to testimony on hearsay grounds not

14  ineffective where objection would have been properly overruled); *Rupe v. Wood*, 93 F.3d 1434,

15  1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance . . .

16  .").

17          Here, the trial judge reasonably found that the graph was not extrinsic evidence and

18  merely reflected the juror's "thoughts on paper."  Lodged Doc. 11, Rep.'s Tr. vol. 3, 763.

19  Nothing in the record, and Petitioner fails to show, that the juror had any specialized knowledge

20  about DNA evidence, or that the juror further investigated how DNA evidence worked.  Because

21  Petitioner cannot show prejudice from appellate counsel's failure to raise the jury misconduct

22  claim, Petitioner's claim of ineffective assistance of appellate counsel is without merit.

23                          VI.  ORDER

24          For the foregoing reasons, IT IS HEREBY ORDERED that:

25          1.  Petitioner's application for writ of habeas corpus is DENIED and DISMISSED with

26  prejudice;

21

2.  The Clerk of Court is DIRECTED to enter judgment; and

3.  The Court DECLINES to issue a certificate of appealability.

DATED:       February 22, 2011.

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE